# EXHIBIT 1

# EXHIBIT 1

1
2
3
4
5
6
7

IN THE SUPERIOR COURT OF WASHINGTON
IN AND FOR KING COUNTY

8

HOLLIANNE AND JACOB
YRACEBURU,
9
                                                    NO.

                          Plaintiffs,
10                                                  SUMMONS

11      vs.

12      JPMORGAN CHASE BANK, N.A., and
        NAVY FEDERAL CREDIT UNION
13
                          Defendants.
14

15      **TO THE DEFENDANT:** JPMORGAN CHASE BANK, N.A.

16           A lawsuit has been started against you in the above-entitled court by the Plaintiff.  This claim
17
        is stated in the written Complaint, a copy of which is served upon you with this Summons.
18
             In order to defend against this lawsuit, you must respond to the Complaint by stating your
19
        defense in writing, and by serving a copy upon the person signing this Summons within twenty (20)
20
        days (in state) or sixty (60) days (out of state) after the service of this Summons, excluding the day of
21
        service, or a default judgment may be entered against you without notice.  A default judgment is one
22
        where a plaintiff is entitled to what has been asked for because you have not responded.  If you serve
23

Summons - I

**ANDERSON | SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665 / F (206) 395-2719

1    a notice of appearance on the undersigned person, you are entitled to a notice before a default

2    judgment may be entered.

3         If you wish to seek the advice of an attorney on this matter, you should do so promptly so that

4    your written response, if any, may be served on time.

5         **THIS SUMMONS** is issued pursuant to Rule 4 of the Superior Court Civil Rules of the

6    State of Washington.

7

8         Respectfully submitted this 15th day of February, 2024.

9

10                              **ANDERSON SANTIAGO, PLLC**

11                              By:
                                Jason D. Anderson, WSBA No. 38014
12                              T. Tyler Santiago, WSBA No. 46004
                                Attorneys for Plaintiff
13                              207B Sunset Blvd. N.
                                Renton, WA 98057
14                              (206) 395-2665
                                (206) 395-2719 (fax)
15

16

17

18

19

20

21

22

23

Summons - 2

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF WASHINGTON
IN AND FOR KING COUNTY

8

| | |
|---|---|
| HOLLIANNE AND JACOB YRACEBURU, | NO. |
| Plaintiffs, | SUMMONS |
| vs. | |
| JPMORGAN CHASE BANK, N.A., and NAVY FEDERAL CREDIT UNION | |
| Defendants. | |

**TO THE DEFENDANT:** NAVY FEDERAL CREDIT UNION

A lawsuit has been started against you in the above-entitled court by the Plaintiff. This claim is stated in the written Complaint, a copy of which is served upon you with this Summons.

In order to defend against this lawsuit, you must respond to the Complaint by stating your defense in writing, and by serving a copy upon the person signing this Summons within twenty (20) days (in state) or sixty (60) days (out of state) after the service of this Summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where a plaintiff is entitled to what has been asked for because you have not responded. If you serve

Summons - 1

ANDERSON | SANTIAGO
207B Sunset Blvd N.
Renton, WA 98057
(206) 395-2665/F (206) 395-2719

1  a notice of appearance on the undersigned person, you are entitled to a notice before a default

2  judgment may be entered.

3        If you wish to seek the advice of an attorney on this matter, you should do so promptly so that

4  your written response, if any, may be served on time.

5        **THIS SUMMONS** is issued pursuant to Rule 4 of the Superior Court Civil Rules of the

6  State of Washington.

7

      Respectfully submitted this 15th day of February, 2024.

8

9

10          **ANDERSON SANTIAGO, PLLC**

11          By:

12          Jason D. Anderson, WSBA No. 38014
        T. Tyler Santiago, WSBA No. 46004

13          Attorneys for Plaintiff
        207B Sunset Blvd. N.

14          Renton, WA 98057
        (206) 395-2665

15          (206) 395-2719 (fax)

16

17

18

19

20

21

22

23

Summons - 2

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF WASHINGTON
IN AND FOR KING COUNTY

8

9    HOLLIANNE AND JACOB
     YRACEBURU,                                NO.

10
                                               **COMPLAINT**
          Plaintiffs,

11

12        vs.

13   JPMORGAN CHASE BANK, N.A., and
     NAVY FEDERAL CREDIT UNION

14        Defendants.

15

16        COME NOW Plaintiffs, Hollianne and Jacob Yraceburu, by and through counsel, who

17   allege:

18                    I.    <u>**PARTIES AND JURISDICTION**</u>

19        1.    Plaintiff Hollianne Yraceburu, a disabled veteran of the United States Marine

20   Corps, and Plaintiff Jacob Yraceburu are a married couple who reside in Washington State.

21        2.    Defendant JPMorgan Chase Bank, N.A. ("JPMCB") is a federally-chartered

22   national bank doing business in Washington State.  JPMCB may be served at any branch.

23        3.    Defendant Navy Federal Credit Union ("NFCU") is a federally-chartered credit

Complaint - 1

**ANDERSON|SANTIAGO**
207B Sunset Blvd n.
Renton, WA 98057
(206) 395-2665/F (206) 395-2719

1  union doing business in Washington State.  NFCU may be served at any branch location.

2      4.      Jurisdiction over Defendants is proper, and venue is proper as Defendants are

3  doing business in King County, Washington State.

4                          **II.      FACTS**

5      5.      Plaintiff Hollianne Yraceburu (formerly Hollianne Ervin) purchased a 2019

6  Volvo SUV, and in doing so, obtained a loan through Defendant JPMCB.  Ms. Yraceburu made

7  her monthly payments on time, every time.

8      6.      In November 2021, Ms. Yraceburu was offered a much better interest rate

9  (3.74%) by Defendant NFCU, so she entered into a loan agreement with NFCU to refinance her

10  automobile loan.

11      7.      As part of its process for such refinance loans, NFCU provided a check to Ms.

12  Yraceburu (made payable to the original lender, JPMCB) for the entire quoted payoff of the

13  JPMCB loan.  On November 4, 2021, exactly one week before Veteran's Day, Ms. Yraceburu

14  went to a JPMCB branch to provide the check.

15      8.      At approximately 4:00 p.m. that day, Ms. Yraceburu approached the teller and

16  inquired about the steps to provide JPMCB with the check to pay off her loan.  The teller

17  reviewed the check in Ms. Yraceburu's hands and instructed Ms. Yraceburu to place her

18  signature in a particular location on the check, among other ministerial details.  Ms. Yraceburu

19  had some hesitation, as the directions on the face of the check were not entirely clear, but the

20  teller insisted – with increasing frustration and urgency – that the teller's instructions were

21  correct and that Ms. Yraceburu do as instructed and place her signature exactly how the teller

22  described.

23      9.      In her time serving our country in the Marine Corps, Ms. Yraceburu was

Complaint - 2

**ANDERSON | SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

1    particularly familiar with the concept of picking one's battles, and thus she did as the teller

2    instructed.  The transaction concluded, and Ms. Yraceburu was provided with a receipt reflecting

3    payment of $22,948.64, which was the entire balance of her loan.

### JPMCB Confirms the Loan Payoff and Releases its Lien

5        10.     The next day – Friday, November 5, 2021 – JPMCB sent a letter to Ms.

6    Yraceburu thanking her for paying off her loan, which began with boldface font in the subject

7    line **"Update: Your account is now paid in full,"** and which included the certificate of title to

8    her vehicle and instructed her to go to a vehicle licensing office to formally obtain a lien-free

9    title.  The body of the letter began with the sentence "Congratulations on paying off your account

10   with us."  The next paragraph began, also in boldfaced font, **"We released our lien."**

11       a.   The letter also confusingly included a request to "please wait until all payments

12           clear to transfer the title."  As Ms. Yraceburu was not transferring title to anyone

13           and had no immediate intention of doing so, there was no action to be taken.

14       11.     The very next business day – Monday, November 8, 2021 – JPMCB sent another

15   letter, this time to inform Ms. Yraceburu that she had slightly overpaid (due to interest which had

16   not yet accumulated prior to the payoff) and enclosing a check for the balance owed to Ms.

17   Yraceburu.  The letter made sure to include the phrase "Congratulations on paying off your

18   Chase Auto vehicle loan!"  A copy of the foregoing letters and the receipt received from the

19   teller is attached as **Exhibit A**.

20       12.     Somewhat curiously, around the same time, NFCU sent a letter to Ms. Yraceburu

21   which contained contradictory information, as well as typographical errors and certain statements

22   which were functionally nonsense.  The gist of the letter appeared to indicate there was some

23   problem with the check (which NFCU had issued and JPMCB had accepted), but the letter's lack

Complaint - 3

of details (as well as obvious errors) made it unclear what, if anything, was occurring or needing to be done. Ms. Yraceburu had no idea what it meant for the "payee to contact his/her financial institution," as JPMCB was the payee, and, presumably, JPMCB was also the financial institution. In total, the letter appeared to be some type of automatically-generated letter in error (as it made little sense to have JPMCB contact itself, or how Ms. Yraceburu was involved in whatever that process would be).

13.    What was clear, as the year 2021 wound to a close and 2022 began, was that JPMCB had (a) repeatedly thanked Ms. Yraceburu for paying off her loan, (b) released its lien, (c) provided the certificate of title to Ms. Yraceburu, and (d) provided a refund for the small overpayment of interest. Moreover, on information and belief, Plaintiffs never received any calls, letters, emails, or other correspondence from JPMCB which indicated that Plaintiffs owed any money (which they did not) or that JPMCB believed that money was somehow owed. In short, the loan had been paid off.

### Plaintiffs Pay Off NFCU; Six Months Later, Their Car is Repossessed

14.    In approximately June 2022, Plaintiffs began looking to the future, and sought to start a family and buy a home together. In preparation for these events, Plaintiffs positioned themselves to be in an optimal financial position, one part of which involved improving their debt to income ratio (a metric used by home lenders). Plaintiffs decided to pay off their NFCU loan early, and did so by using some of their savings. On or about July 8, 2022, Plaintiffs made a lump sum payment to NFCU to pay off their loan entirely.

15.    As the end of 2022 approached, Plaintiffs traveled to rural California to help a family member with a few matters. As no direct flights existed, in mid-December 2022, Plaintiffs chose to make the trip by driving, which would ensure that Plaintiffs would be able to

Complaint - 4

ANDERSON | SANTIAGO
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

timely return to work and other obligations in Washington State. Accordingly, Plaintiffs made arrangements to stay in a hotel for one night near their destination.

16.     The very night Plaintiffs arrived (on information and belief, December 16, 2022) they returned to a parking lot and found their car missing. Doing everything to stay calm, Plaintiffs contacted the local police department to report the theft, but after some discussion, Plaintiffs were notified that their vehicle was actually located in a "repo lot" of a nearby towing company.

17.     Plaintiffs' anxiety and panic began to increase. They owned their car "free and clear," and held title to their car. Even otherwise-minor issues became larger problems – Plaintiffs had only packed for a single night's journey, and inclement winter weather was forecast to arrive at the mountain passes they would need to cross to get home.

18.     There proved to be no easy solution. As their car was taken from them on a Friday evening, it was nearly impossible to reach anyone (including the towing company) for several days, and the upcoming holidays exacerbated the problem. Plaintiffs spent several days simply trying to figure out what had happened, given the police department's explanation that the taking of the vehicle was "lawful."

19.     Ultimately, Plaintiffs learned that JPMCB believed that Plaintiffs had not paid their loan (despite all objective evidence to the contrary) and thus JPMCB believed it had an entitlement to their vehicle. Plaintiffs had trouble understanding how this was possible, and how – if JPMCB believed it was entitled to loan payments for the past 13 months (i.e. since the payoff occurred in November 2021) – there were no efforts to notify Plaintiffs, and that their vehicle had been taken from a parking lot which they had never previously visited, when Plaintiffs lived in a house in Washington from which the vehicle could have been taken quite easily (if it had

Complaint - 5

ANDERSON | SANTIAGO
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665 / F (206) 395-2719

1  been lawful to do so, which it was not).

2      20.    Plaintiffs decided that there was no other way to return home than to rent a car (at

3  extreme expense, given the one-way journey) and travel through the winter storm passing

4  through Oregon, which they did on December 21, 2022.  All told, the extended and unexpected

5  stay in California cost Plaintiffs a significant amount of money, and required them to return

6  home without a vehicle which they owned.

7                          **Plaintiffs Recover the Vehicle**

8      21.    Over the holidays and into the new year, Plaintiffs continued to discuss the matter

9  with JPMCB.  Due to the low quality of JPMCB's call centers, some representatives would claim

10  they were unable to help (while others demanded payment), and none were able to offer any path

11  toward recovering the vehicle beyond outright paying the entire balance JPMCB claimed was

12  owed (which included interest and fees for over a year of purported non-payments).  Plaintiffs

13  were placed in an impossible position, as failure to re-purchase their car again would result in it

14  being auctioned for a fraction of the value which would otherwise be realized in a private sale

15  (and likely result in further problems given JPMCB's insistence that it was owed money).

16      22.    Thus, left with essentially no other practical option, Plaintiffs acceded to

17  JPMCB's unreasonable demand for payment in full, plus accrued interest and fees, and issued a

18  check.

19      23.    Eventually, after several weeks, with Plaintiffs calling on a near-daily basis (as

20  JPMCB refused to provide any updates) to learn whether they could pick up their car (which they

21  had twice paid for at this point), Plaintiffs were informed they could pick up the car from the

22  California repo lot.  Thus, in mid-January 2023, Plaintiffs woke up well before dawn, drove

23  together from Washington in Mr. Yraceburu's vehicle, and arrived at the repo lot in California.

Complaint - 6

**ANDERSON | SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665 / F (206) 395-2719

24.     Adding insult to injury, evidently the local procedure required Plaintiffs to (a) pay the repo lot's fees, and (b) obtain some type of permission from the local police department, in writing, which required a roughly $40 fee to be paid.  Plaintiffs did as required, picked up the car, and drove separately home.

**Having Now Paid Twice For Their Car, Plaintiffs Learn of the Banks' Problems**

25.     During this time period in December 2022-January 2023, Plaintiffs learn a little of what happened behind the scenes.  As far as Plaintiffs understand the excuses, it appears that JPMCB believed that Plaintiffs never paid off the loan because of some alleged defect in the check provided by NFCU, and, thus, JPMCB believed the loan to be in serious arrears and arranged for repossession.

26.     This is problematic for several reasons.

27.     First, JPMCB went out of its way to repeatedly thank Plaintiffs for paying off their loan, and even sent Plaintiffs their lien-free title, declaring in writing "We released our lien."  There was no equivocation; JPMCB accepted payment and released its lien.

28.     Thus, even if payment was somehow insufficient – which is not possible given that Ms. Yraceburu followed JPMCB's instructions specifically when indorsing the check – JPMCB made the decision to release its lien, and thus *a nonjudicial repossession was unlawful regardless of any other circumstances.*

29.     At the same time, if JPMCB believed the loan to be in arrears, this was news to Mr. and Ms. Yraceburu, who, to their knowledge, never received any correspondence or telephone calls.  Instead, somehow it was more convenient for JPMCB to repossess the car and strand Plaintiffs in California than to place a telephone call.

30.     At the same time, if somehow JPMCB was genuinely unpaid (despite releasing its

Complaint - 7

**ANDERSON|SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

lien), then NFCU retained use of the funds which it "loaned," while simultaneously receiving regular loan payments from Plaintiffs. In other words, if JPMCB's version of events is fully and entirely true, then (A) it still could not have lawfully repossessed the vehicle, and (B) NFCU was accepting money (including the entire payoff of the loan in July 2022) despite having loaned zero dollars. A commitment to loan money is not the same thing as actually loaning money.

31.    Most bothersome to Plaintiffs was the lack of meaningful communication; NFCU continued to represent that a loan existed and that said loan was being paid down over time, while JPMCB had already expressed in unequivocal terms that their loan had been fully repaid and even provided the vehicle title. Even once the vehicle had been repossessed, JPMCB did not view the matter as a misunderstanding, but instead, took maximum leverage over the situation to induce payment. Had anyone at any point addressed Plaintiffs as human beings and explained that there had been a minor paperwork error (caused specifically by JPMCB), Plaintiffs would certainly have assisted to resolve the situation.

32.    In any event, once the matter was brought to NFCU's attention, NFCU did not address its acceptance of payments (despite having potentially loaned zero dollars). Instead, NFCU simply refunded the amounts it had been paid by Plaintiffs (roughly $22,000) and not the amounts which JPMCB extracted to retrieve the car from the repo lot (over $25,000), not to mention the fact that NFCU had, potentially, been holding onto Plaintiffs' money (despite not having loaned money) and instead of refunding the amount with interest, NFCU simply retained all the benefits of its missteps.

33.    What is clear, however, is that Plaintiffs are zero percent at fault, regardless of Defendants' excuses. Plaintiffs did everything they were told and paid their loan(s) on time (and early), and when it came time to address the unlawful repossession, both JPMCB and NFCU saw

Complaint - 8

ANDERSON | SANTIAGO
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

1  fit to maximize the benefits to themselves (JPMCB keeping the additional funds/fees/interest,

2  and NFCU returning the principal but retaining whatever interest it had earned). Particularly

3  galling to Ms. Yraceburu is how NFCU treated a disabled veteran, having retained her payments

4  without saying a word, and then returning only the principal when the problem was presented.

**Aftermath**

6      34.    Between having to stay in California far longer than the single night they had

7  planned, spending a considerable amount of time over the holidays on the phone with both

8  Defendants' poorly-run call centers, being forced to pay an inflated amount to ransom their

9  vehicle back from California (only to be forced to drive themselves to and from California at

10  their own expense), Plaintiffs were forced to deplete their savings accounts by thousands upon

11  thousands of dollars. Every penny of these expenses were occasioned by Defendants.

12      35.    Despite the foregoing, Plaintiffs are humans with busy lives who are trying to

13  move to the next phase of their marriage by starting a family, so Plaintiffs were more or less

14  ready to just accept the tremendous loss because they had more important matters to focus on.

15      36.    One of these matters was purchasing a house in which they would raise their

16  children. In late 2023, Plaintiffs had an offer accepted for a home, but during the underwriting

17  process, it was discovered that JPMCB was issuing credit reporting concerning Ms. Yraceburu

18  which stated that she had a loan with JPMCB and that said loan fell into arrears and resulted in a

19  repossession. This presented a tremendous problem obtaining financing for the home upon

20  which an <u>earnest money payment had already been made</u>. This problem persists through today's

21  date and has no clear resolution.

22      37.    As a result of Defendants' actions, Plaintiffs have incurred expenses in dealing

23  with both entities, seeking and retaining counsel in connection with ascertaining their legal rights

Complaint - 9

**ANDERSON | SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

1   and responsibilities, and have suffered financial uncertainty, unease, and distress caused by the

2   false, improper, and confusing nature of the collection efforts.

### III.   CAUSES OF ACTION

#### Count 1 – Negligent Misrepresentation (as to both Defendants)

38.     A defendant is liable for negligent misrepresentation if it (1) supplied false information, (2) that it knew or should have known would be used as guidance in the plaintiff's business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff reasonably relied on the false information, and (5) the false information proximately caused damages. *Ross v. Kirner*, 162 Wash.2d 493, 172 P.3d 701, 704 (2009).

39.     To the extent that JPMCB somehow did not actually receive payment for the refinance of the Plaintiffs' vehicle, JPMCB supplied false information concerning the payoff, and though it had released the lien, the repossession of the vehicle (while unlawful) renders this lien release information false as well. There is no question this information was to be used for Plaintiff's guidance in personal financial affairs, and JPMCB's unlawful repossession of the vehicle demonstrates that it was negligent in communicating to Plaintiffs that the loan had been paid off. Plaintiffs, of course, did rely on this information, making monthly payments to whom they believed was their new lender, NFCU, and this reliance led directly to the damages described herein.

40.     To the extent NFCU never actually loaned any money, NFCU supplied false information on each occasion in which it represented the opposite to Plaintiffs, including by omission when accepting Plaintiffs' loan payments. These representations (that money was owed) were specifically intended to guide Plaintiffs' personal financial business affairs (in that

Complaint - 10

ANDERSON | SANTIAGO
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

they were told to pay the "loan" and thus that the prior loan had been repaid in full), and such actions were plainly negligent, as NFCU would have every reason to know whether it did or did not loan money.  Plaintiffs relied on these statements concerning the existence of a loan, and continued to make payments to NFCU including full repayment of the "loan" and such actions caused Plaintiffs the damages described herein.

41.    Defendants are therefore liable for the tort of negligent misrepresentation.

**Count 2 – Conversion (as to both Defendants)**

42.    Conversion occurs when a person intentionally interferes with chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the rightful owner of possession. *Alhadeff v. Meridian on Bainbridge Island, LLC*, 167 Wn.2d 601, 619 (2009).

43.    Damages for conversion include the fair market value of the property, as well as damages for loss of use. *Potter v. Washington State Patrol*, 165 Wn.2d 67, 85–86 (2008). Emotional distress damages are available for intentional torts. *Birchler v. Castello Land Co., Inc.*, 133 Wn.2d 106, 116 (1997) (Washington "has indeed recognized that damages for inconvenience, discomfort and mental anguish may result from an intentional interference with property interests") (citing *Schwarzmann v. Association of Apartment Owners of Bridgehaven*, 33 Wn.App. 397, 404 (1982)).

44.    Defendants deprived Plaintiffs of their vehicle, their money, or both.  Defendant JPMCB deprived Plaintiffs of their vehicle (and potentially their money), and Defendant NFCU deprived Plaintiffs of ownership of their money (and potentially their vehicle) by accepting payments when no money had been loaned.

45.    These actions were unlawful, and Defendants are therefore liable to Plaintiffs for the tort of Conversion.

Complaint - 11

**ANDERSON|SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

## Count 3

### (Consumer Protection Act Claim)

46.    The five elements of a Consumer Protection Act claim, RCW Chapter 19.86, are (1) an unfair or deceptive act (2) in trade or commerce (3) that affects the public interest, (4) injury to the plaintiff's business or property, and (5) a causal link between the unfair or deceptive act and the injury. *Klem v. Washington Mut. Bank*, 176 Wn.2d 771, 782 (2013). Certain elements may be met on a "per se" basis if an applicable statute is violated. *See Rush v. Blackburn*, 190 Wn. App. 945, 961 (2015) (citations omitted).

47.    Where an act or practice is not specifically regulated by statute (meaning not "per se" claims), whether an act or practice is "unfair" or "deceptive" is determined case by case. *Klem v. Washington Mut. Bank*, 176 Wn.2d 771, 785 (2013). This is done in light of the liberal construction of the CPA. *Panag v. Farmers Ins. Co. of Washington*, 166 Wn.2d 27, 40 (2009) (citing RCW 19.86.920). "[A]n act or practice can be unfair without being deceptive." *Klem*, 176 Wn.2d at 787. A communication may be accurate <u>yet still be deceptive</u>, and a truthful communication may be deceptive by virtue of the "net impression" it conveys. *Panag* , 166Wn.2d at 49-50. Accordingly, the CPA governs unfair <u>or</u> deceptive acts <u>or</u> practices.

48.    Defendants' actions described herein constitute unfair act(s) or practice(s) in connection with trade or commerce. JPMCB actions as described above (including repossessing a car despite having no lien, and issuing communications indicating payment in full of the loan) are most certainly "unfair," and also very likely "deceptive," given that Plaintiffs had every reason to rely on the bank's statements and actions so that they could go about their lives undisturbed. NFCU's actions as described above (including making a loan while retaining the proceeds, yet failing to notify Plaintiffs, while accepting "loan payments" from Plaintiffs, and ultimately

Complaint - 12

**ANDERSON | SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

refunding only the principal amounts paid while retaining the benefits) also are "unfair" actions or practices, and are also deceptive, given that Plaintiffs would have had no need to pay for a loan which was not made, and revelation of this foundational fact would have caused Plaintiffs to resolve the matter directly instead of learning of their banks' mistakes while stranded in another state.

49.     As to the "public interest" element, the Washington Supreme Court has made clear that the existence of statutes regulating conduct in a field, such as debt collection, demonstrates that a "public interest" exists in that field. *See Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 53 (2009) ("Our legislature has declared that violations of the regulations applicable to either industry [insurance and debt collection] implicate the public interest and…there is nevertheless no doubt that after decades of intensive regulation, members of the public have come to expect that insurers and collection agencies may be held accountable…"); *see also* RCW Title 30A ("Washington Commercial Bank Act"); RCW 31.04.208 (Violation of lending regulations is a matter of public interest, though banks are not subject to that specific statute); 12 U.S.C. § 1 et seq. (federal title regulating national banks). Absent any statutes directed toward lending or banking, "public interest" is established by examining several non-exclusive factors. *See Svendsen v. Stock*, 143 Wn.2d 546, 559 (2001). Defendants' actions in consumer banking and advertising, along with the disparity in bargaining positions, most certainly implicates the public interest in the lending and recovery actions taken by banks and credit unions.

50.     Plaintiffs were injured by Defendants' actions, as outlined above, resulting in substantial expenses and payment of interest and fees, all caused by Defendants' unfair or deceptive acts or practices.

51.     Therefore, Defendants violated the Washington Consumer Protection Act, RCW

Complaint - 13

Chapter 19.86.

**Count 4 – Outrage**

52.    The tort of outrage requires the proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d 192, 195 (2003).

53.    Defendants' conduct was extreme and outrageous in that their actions betrayed the fundamental nature of their industries. The nature of Defendants' businesses – and departure from accepted norms and laws – informs the severity and extremity of the conduct. For example, it may not be "outrageous" for an acquaintance to renege on an agreement, but for a federally-chartered bank to state that it had been paid in full, only to then repossess a car under the cover of night (and make a disabled veteran scramble for accommodations and ultimately drive for nearly 20 hours to retrieve said vehicle) is beyond any possible bounds of decency. Similarly, for Navy Federal Credit Union, a federally-chartered credit union, to represent that it had loaned money (and thus accomplished the refinance loan) when it had not, only to happily receive payments from a disabled veteran and her husband is also beyond the boundaries of decent behavior.

54.    Defendants' conduct was, at minimum, reckless, although the fact that Defendants' agents had every opportunity over dozens of phone calls to rectify the issues (but refused to do so) suggests that the actions were ultimately intentional.

55.    Plaintiffs did suffer severe emotional distress in varying degrees and intensities. Ms. Yraceburu suffers from various conditions as a result of her time serving our country, and Mr. Yraceburu has a great deal of concern for his wife, as well as his own challenges. Defendants' actions literally left Plaintiffs stranded in another state in the middle of winter and required them to traverse extremely difficult winter conditions as a result of the delays caused by Defendants,

Complaint - 14

**ANDERSON | SANTIAGO**
207B Sunset Blvd N.
Renton, WA 98057
(206) 395-2665/F (206) 395-2719

1  not to mention the fact that Defendants' actions required Plaintiffs to pay twice for their own

2  vehicle without knowing whether they would ever see a dime of the amounts they were forced to

3  pay. While Plaintiffs are not alleging extortion at this time, it is difficult to see how any nonlawyer

4  would see this any differently.

5      56.     This conduct did cause severe emotional distress to Plaintiffs and Defendants are

6  liable for the tort of outrage.

7  **Request for Injunctive Relief**

8      57.     A plaintiff may seek injunctive relief for violations of the Consumer Protection

9  Act. RCW 19.86.090.

10      58.     Plaintiffs do seek injunctive relief from this Court which would enjoin Defendants

11  from collecting debts or administering loans in the manner described above from both Plaintiffs

12  and any other person similarly situated. *Scott v. Cingular Wireless*, 160 Wn. 2d 843, 853 (2007).

13      59.     Specifically, Plaintiffs seek an injunction prohibiting JPMCB from repossessing

14  cars to which it has no entitlement, and/or from sending letters declaring a loan paid in full when

15  the opposite is true. Plaintiffs seek an injunction prohibiting NFCU from taking loan payments

16  on loans which it has not made, and from retaining the benefits to such payments (i.e. interest)

17  when they are discovered.

18      60.     Plaintiffs has reason to believe these actions may constitute a pattern and practice

19  of behavior and have impacted other individuals similarly situated.

20      61.     Injunctive relief is necessary to prevent further injury to Plaintiffs and to the

21  Washington public as a whole.

22      62.     Injunctive relief should therefore issue as described herein.

23

Complaint - 15

## IV. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

1.    For Judgment against Defendants for actual damages.

2.    For statutory damages of $7,500.00 per violation, for Consumer Protection Act violations.

3.    For treble damages, pursuant to RCW 19.86.090, calculated from the damages determined by the court.

4.    For costs and reasonable attorney's fees as determined by the Court pursuant to RCW Chapter 19.86.

5.    For injunctive relief pursuant to RCW 19.86.090 as described above.


Respectfully submitted this 15th day of February, 2024.


**ANDERSON SANTIAGO, PLLC**


By: _____
Jason D. Anderson, WSBA No. 38014
T. Tyler Santiago, WSBA No. 46004
Attorneys for Plaintiffs
207B Sunset Blvd N.
Renton, WA 98057
(206) 395-2665
(206) 395-2719 (fax)

Complaint - 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# EXHIBIT A

# CHASE

Deposit cash or checks at a
Chase DepositFriendly (SM) ATM.
An image of your check can
be printed on your receipt.

My Transaction Summary
**************************************

Transaction #214
Account Number Ending In:          1007
Payment-Installment          **$22,948.64**

Regular Payment Amount       $22,948.64
.....................................

JPMorgan Chase Bank, N.A.
Johnson Creek and SE 82nd Ave, Branch 7
40279
1-800-935-9935
Your satisfaction matters. Share your
feedback at: **chase.com/sendusfeedback**

Member FDIC, Equal Housing Lender
Please keep your receipt
11/04/2021 16:02

Business Date **11/04/2021**
Session #90

Thank you - **Amanda**
Cashbox #07

Thank you for your payment. Your
payment will be applied according
to the terms & conditions of your
account(s), which may differ from
what you've requested.



**CHASE**
LA4-4099
700 Kansas Lane
Monroe LA 71203

**Questions?**

📞 (800) 336-6675

We accept operator relay calls

11/05/2021

HOLLIANNE L ERVIN

| | |
|---|---|
| *Account Number:* | Ending in 1007 |
| *Vehicle:* | 2019 VOLVO XC40 |
| *VIN:* | ▓▓▓▓▓▓4716 |

## Update: **Your account is now paid in full**

Dear HOLLIANNE L ERVIN:

Congratulations on paying off your account with us! Please take the enclosed title to your state motor vehicle titling agency to obtain a lien-free title to your vehicle. Before you go, check with the titling agency about other documents or fees that may be required.

**We released our lien, but please wait until all payments clear to transfer the title**
Here's what happens if a payment is returned to us, or if additional charges or fees are assessed to the account after the payoff posts:

- We will reinstate your account for unpaid amounts.
- You may be responsible for fees related to returned payments.
- Any excess payment refunds we may have issued will need to be returned to us.

***You may be due a refund for credit insurance or guaranteed automobile protection (GAP)***
*You may be due a refund if you financed through a dealership and purchased credit insurance and/or a GAP product. Please contact your dealership if you paid off your loan early and your payoff did not include a refund credit.*

Enjoy your vehicle and thank you for financing through us. We hope you will think of us the next time you need financing.

If you have questions, please call us at (800) 336-6675.

Sincerely,

Title Management

Enclosure
This letter is for informational purposes only and is not an attempt to collect a debt for which personal liability has been discharged in a bankruptcy case or from a debtor that is in an open bankruptcy case, subject to the automatic stay.

RO                                                                PDS-21201


HOLLIANNE LYNNE ERVIN

Chase Auto
PO Box 184055
Columbus, OH 43218-4056

# CHASE ◯ Auto

11/8/2021

HOLLIANNE L ERVIN

Your account ending in 1007

Dear HOLLIANNE L ERVIN:

Congratulations on paying off your Chase Auto vehicle loan! You had a credit balance on your account, so we're returning that amount in the attached check.

**Even after we release our lien, please wait until all payments clear before you transfer the title.**
If a payment is returned to us, or additional charges or fees are assessed after your payoff posts:

- We will reinstate your account for unpaid amounts.
- You may be responsible for fees related to returned payments.
- Any excess payment refunds we may have issued will need to be returned to us.

Enjoy your vehicle and thank you for financing through us. We hope you will think of us the next time you need financing. If you have questions, please call us at 1-800-336-6675.

Sincerely,
Chase Auto

Esta carta contiene información importante de la cuenta. Si tiene alguna pregunta, por favor llame al 1-800-336-6675.

# CHASE ◯

Chase Auto Finance
PO Box 182002
Columbus, OH 43218-2056

JPMorgan Chase Bank, N.A.
Syracuse, NY

*Twenty-Seven Dollars and Nineteen Cents*

$27.19

HOLLIANNE L ERVIN